IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 4:13-CR-3048 |
| vs. | |
| JIMMY L. POWERS, | MEMORANDUM AND ORDER ON RESTITUTION |
| Defendant. | |

This matter is before the Court to determine the proper amount of restitution owed by defendant Jimmy L. Powers. Powers pleaded guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344. The parties agree that Town and Country Bank was the victim of this fraud, and that Powers is obligated to pay restitution under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. §§ 3663A–3664. But they agree on little else—including who should receive any restitution payment.

A sentencing hearing was held October 21, 2013, at which the Court received additional evidence and heard arguments from both parties. At that time, the Court informed the parties that restitution would be imposed, in an amount to be determined following sentencing, and gave the parties an opportunity to present supplemental briefs. *See*, § 3664(d)(5); *Dolan v. United States,* 130 S. Ct. 2533, 2544 (2010). The remainder of Powers' sentence was imposed on October 21, 2013, and his judgment of conviction was formally filed on October 24, 2013. *See* filings 30, 31, and 39.

The Court now has before it the presentence investigation report ("PSR"), the parties' briefs, Powers' objection to the Court's tentative sentencing findings, and the evidence offered before and at the sentencing hearing, and the matter is fully submitted. Powers will be ordered to pay $138,500.60 in restitution to the Bank. This amount comprises the outstanding principal and accrued interest on Powers' loans as of June 29, 2009, and excludes several other amounts, discussed below. Powers' objections to the Court's tentative findings (see filings 27 and 28) are, with one exception, overruled.

## BACKGROUND

Powers operated a hay business in Gibbon, Nebraska. PSR ¶ 17. Beginning in 2003, the Bank extended loans to Powers for various purposes, including the purchase of farm equipment and to cover operational expenses. PSR ¶ 19. Powers, in turn, signed security agreements pledging as collateral various farm assets, including hay and hay products, and granting the Bank a first security interest in this collateral. PSR ¶ 18. Under the agreements, Powers was required to deposit proceeds from hay sales with the Bank in order to pay down the operating loan balances. PSR ¶ 18.

However, between approximately November 2006 and December 2007, Powers failed to pay over proceeds from the sale of secured hay. PSR ¶ 21. In total, he failed to pay over approximately $264,023.03 in hay proceeds. PSR ¶ 22. Powers instead deposited these funds in new accounts with two other banks. PSR ¶ 22. The majority of those proceeds have been neither accounted for nor recovered.

Powers explained that in 2007, he invested in equipment to produce dairy-quality hay. PSR ¶ 32. Due to bad weather, he was forced to sell his hay at a significant loss. PSR ¶ 32. Powers claims that he then began diverting proceeds from selling secured hay in order to keep his business afloat. He used the money to pay operating expenses and the landowners on whose farms he was growing hay. But he also used the proceeds for his own living expenses. Filing 23 at 4–5. Powers has not provided any further details on how these funds were spent, nor what percentage of the funds went to pay operating expenses and landlords versus his personal expenses.

In late November 2007, Powers filed for bankruptcy. PSR ¶ 25. In August 2008, the Bank obtained an order from the bankruptcy court authorizing the Bank to repossess hay, equipment, and other collateral. PSR ¶ 27. The Bank applied the proceeds from the sale of this collateral to Powers' outstanding debt. PSR ¶ 27. The results of the Bank's recoupment efforts will be discussed below.

The parties have agreed that the total amount of funds improperly diverted by Powers was $264,023.03. Filing 7 at 3–4; filing 23 at 4. And under the parties' plea agreement, Powers acknowledged that restitution would be ordered in "the amount of $264,023.03 less any amount paid prior to sentencing."[1] Filing 7 at 4. The parties dispute the proper method for calculating restitution, what types of loss may be included in the restitution award, and who should receive the restitution. The government and the Bank

---

[1] The Court notes at the outset that its restitution calculation is not constrained by the parties' plea agreement. The agreement was made pursuant to Fed. R. Crim. P. 11(c)(1)(B) and is therefore not binding upon the Court. Moreover, the Court has an independent obligation to determine the full amount of the Bank's loss under the MVRA. *Cf.*, § 3664(f)(1)(A); *United States v. Alexander*, 679 F.3d 721, 731 (8th Cir. 2012).

seek restitution in the amount of $207,967, which represents the sum of the unpaid principal balance on Powers' loan, the accrued interest, and various costs, including attorney fees, incurred by the Bank. The government argues that had Powers not diverted $264,023.03 in proceeds, much of that money would have been available to pay these costs.

The Court begins with the principal. When Powers began diverting proceeds in November 2006, the outstanding principal balance on his loans was $302,103. Filing 19-2 at 1. While Powers was diverting proceeds, he continued to receive advances on these loans, and by the time he filed for bankruptcy, the unpaid principal balance was $439,550.66. Filing 19-2 at 1–13.

From January to August of 2008, Powers made payments at the direction of the bankruptcy court, bringing the principal balance down to $329,498.96. Filing 19-2 at 14. Beginning in August 2008 and continuing until June 29, 2009, the Bank repossessed and sold various collateral, including hay and farm equipment. PSR ¶¶ 27, 36; filing 19-1 at 1. James Friesen, an executive vice president with the Bank, submitted an itemization of the costs incurred by the Bank in collecting and selling the collateral. Filing 19-3. And he testified in further detail at the sentencing hearing as to the nature and necessity of these expenses. The costs included baling and transporting the hay, paying the landlords' shares of the proceeds, and hay quality testing—expenses and tasks that Powers would normally have undertaken. Filing 19-3. The Bank applied the net proceeds of these efforts, $247,903.62, to the remaining unpaid balance. PSR ¶¶ 27, 36, & pp. 17–18; filing 19-1 at 1; filing 19-2 at 14–15. As of June 29, 2009, this left an unpaid principal balance of $81,595.[2] Filing 19-1 at 1, filing 19-2 at 15.

As noted above, the government and the Bank are also seeking an award of restitution for the accrued interest on Powers' loans and for certain unpaid "collection costs." Specifically, the Bank seeks the interest on Powers' loans (at the contractual rate) that had accrued as of June 29, 2009, the date the Bank finalized its collection efforts. Filing 19-1 at 1; filing 19-4 at 3; filing 38 at 3; filing 31 at 18:00–20:50, 41:30–44:00. This amounts to an additional $87,661.46. Filing 19-1 at 1. The Bank also requests $43,710.20 in unspecified "unpaid collection costs," which consists primarily of attorney fees the Bank incurred in securing access to its collateral in the bankruptcy proceedings. Filing 19-1 at 1; filing 31 at 19:00–20:30. The Court will simply refer to these costs as the Bank's attorney fees, in order to distinguish them from the costs incurred by the Bank in disposing of Powers' collateral (e.g.,

---

[2] The amount is listed variously as $81,595.10 and $81,595.34. *Compare, e.g.*, filing 19-1 at 1, *with* filing 19-2 at 15. Neither party has contended that the discrepancy matters, so the Court has simply rounded to the nearest whole number.

- 3 -

selling and transporting the hay). Those costs were itemized and offset against the gross proceeds obtained from the sales.[3] Filing 19-3; filing 38. In contrast, there has been no detail provided regarding the Bank's attorney fees. Added together, the principal, interest, and attorney fees come to $212,967. Filing 19-1 at 1.

The Bank's request was subject to one final adjustment. Powers' debt was based on 11 promissory notes held by the Bank. Filing 31 at 44:30–45:45. By June 2009, the Bank had consolidated the outstanding principal into one note (number 10117). Friesen explained that this was simply an accounting decision; the Bank had the discretion to apply payments to any of the notes. Filing 19-2 at 15; filing 31 at 46:00–47:15, 49:00–50:00. In May 2010, the Bank sold six of the notes (including number 10117) for $5,000 to Trotter Inc., another creditor of Powers. Trotter had approached the Bank because the Bank held a trust deed to Powers' residence that had priority over Trotter's interest in the residence. Trotter offered to purchase the Bank's deed as well as all notes referencing the deed. At the hearing, Friesen explained that he had forgotten this when preparing his previous submissions and agreed that Powers should be given credit for the $5,000. Filing 31 at 42:00–44:00, 47:15–50:00, 59:00–1:00:15; filing 41-1. So, the final amount of restitution requested by the Bank is $207,967. Filing 31 at 18:00–20:50, 41:30–44:00.

## ANALYSIS

As noted above, Powers raises a number of objections to the restitution requested by the Bank. He disputes the method used by the Bank and government to calculate the Bank's loss, the amount of restitution that should be paid even using that method, and who should receive any restitution payment. Powers' arguments and the corresponding objections to the Court's tentative findings (see filings 27 and 28) are, with one exception, overruled.

Restitution in this case is governed by the MVRA, which requires defendants convicted of a crime committed by fraud or deceit (such as 18 U.S.C. § 1344), to make restitution to the victims of the offense in the full

---

[3] In its supplemental brief, the government conflates the two categories of costs, and characterizes the $47,710.20 as costs incurred in the disposition of Powers' collateral (i.e., the transportation and selling). This is not supported by the record. Friesen testified that the $43,710.20 was composed primarily of attorney fees the Bank incurred in the bankruptcy proceedings. Filing 31 at 19:00–20:30. The Bank included all of the costs incurred in disposing of collateral in its calculation of the net proceeds; the $43,710.20 is not among these costs. *See* filing 19-3. To the extent there are expenses other than attorney fees in the $43,710.20, they have not been identified with sufficient particularity to permit an award of restitution. *See* part II, *infra*.

- 4 -

amount of each victim's loss. §§ 3663A(c)(1)(A)(ii) and 3664(f)(1)(A). The government has the burden to demonstrate the amount of such loss by a preponderance of the evidence. § 3664(e). The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme." § 3663A(a)(2). Powers concedes that the Bank is a victim for purposes of the MVRA. *See* filing 41 at 1.

The methods used to calculate financial loss depend upon the context, and different considerations apply to loss under the Sentencing Guidelines, in contrast to loss in the context of restitution. Loss calculations under the Guidelines seek to assess the defendant's culpability and are solely punitive in nature. Restitution, on the other hand, focuses on redressing the harm caused to the victims of crime. *United States v. Gossi,* 608 F.3d 574, 581 (9th Cir. 2010). The goal of restitution is to put the victim back in the position it would have been but for the defendant's criminal conduct. *Id.* So, the amount of restitution cannot exceed the actual, provable loss realized by the victim. *United States v. Martinez,* 690 F.3d 1083, 1088 (8th Cir. 2012). These losses must be causally connected to the defendant's criminal conduct, and this connection cannot be unreasonably extended. *United States v. Spencer,* 700 F.3d 317, 323 (8th Cir. 2012).

### I. Calculating the Bank's Loss

Powers first argues that the government and Bank have used a fundamentally flawed method to calculate restitution, which impermissibly "transform[s] the entire amount loaned to Powers into a criminal loss for purposes of computing restitution." Filing 23 at 4. He proposes that the correct method for calculating restitution is the difference between the amount recovered from the sale of collateral and the amount of proceeds diverted—$264,023.03 minus $247,903.62—which would result in restitution of $16,119.41 (minus an additional $5,000 for the assignment to Trotter). Essentially, Powers argues that because he did not obtain the loan by fraud, it is improper to convert the entire loan balance into a loss.

Powers' argument rests upon the assumption that the Bank must use proceeds from the sale of other, non-diverted collateral to pay off the amount diverted before paying off Powers' remaining debts. But Powers has not offered any legal basis for this assumption, and it runs afoul of the underlying purpose of the MVRA: to ensure that victims of a crime receive full restitution. *Dolan v. United States,* 130 S. Ct. 2533, 2539 (2010). Here, that means putting the Bank back in the position it would have been in had Powers not diverted $264,023.03 in hay proceeds. By selling other collateral,

the Bank was able to recoup some—$247,903.62—but not all, of the $329,498.96 in unpaid principal on Powers' loans. There is no reason the Bank should take a loss on the remaining debt in order to first pay off the losses caused by Powers' criminal conduct. Stated differently, if Powers had not sold the hay, or had paid the Bank the proceeds, the Bank would have had more funds available to cover the outstanding principal. Due to Powers' fraud, the Bank has been left with less money than it would have had otherwise, and it is entitled to restitution of the difference.

Powers next argues that because he used the $260,000-some in diverted proceeds to pay his landlords and operating expenses (and his own living expenses), there would not have been much money left over for the Bank even if he had properly paid over the proceeds. In other words, Powers argues that the Bank's loss was caused by economic circumstances beyond his control, rather than his criminal conduct. But Powers has failed to support this claim with any evidence, nor even a rough accounting of how he spent the proceeds. To begin with, the Court has no idea how much Powers spent on his own living expenses—a cost that is clearly subordinate to the Bank's security interest. And while Friesen admitted that sums due to landlords would have come out of the proceeds, Powers has failed to show what those sums were, let alone what amount of the proceeds went to his other unspecified operating expenses. Filing 31 at 52:00–56:00. And given the Bank's priority security interest, it is not at all clear that many of these other expenses would have been paid before the Bank took its share.

Ultimately, the question is not how many dollars were improperly diverted, but what loss the diversion caused. And the Court finds that, had Powers not diverted the proceeds, there would more likely than not have been enough money to pay the outstanding principal. In sum, the Court finds that the government's request provides a sound starting point for determining the restitution award. While Powers has additional objections to the overall amount of any restitution award, he does not have any further qualms with paying restitution of the unpaid principal. The Bank is therefore entitled to restitution of principal in the amount of $81,595.

The Court next turns to the Bank's request for the accrued interest on the loan, in the amount of $87,661.46. While Powers has not focused his argument on the matter, he has at least implicitly challenged the Bank's entitlement to interest. There is, however, no reason the Bank should not receive the interest Powers was obligated to pay under the terms of his loans. As noted above, the purpose of the MVRA is to make victims of crime whole. *United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004). And foregone interest is one component of a victim's actual loss. *Id.* at 1058. As with the principal, had Powers not diverted the hay proceeds, additional funds would

have been available to pay down the interest. The Court therefore finds that the Bank is entitled to restitution of the requested interest accrued as of June 29, 2009, in the amount of $87,661.46. *See, United States v. Engelmann,* 720 F.3d 1005, 1016 (8th Cir. 2013); *United States v. Morgan,* 376 F.3d 1002, 1005, 1014 (9th Cir. 2004).

## II. Attorney Fees

While Powers has not explicitly objected to an award of attorney fees, the Court has an independent obligation to ensure that the entire amount of restitution is permitted by statute and supported by the evidence. The Bank's entitlement to attorney fees presents a potentially complex question of law. *See, e.g., United States v. Robers,* 698 F.3d 937, 953–55 (7th Cir. 2012), *cert. granted* --- S. Ct. ----, 2013 WL 775438 (2013); *United States v. Corey,* 77 Fed. Appx. 7 (1st Cir. 2003); *United States v. Akbani,* 151 F.3d 774, 780 (8th Cir. 1998). But it is a question the Court need not resolve, as the government has not sufficiently accounted for these costs. The record shows only that the bulk of the costs were attorney fees incurred in the bankruptcy proceeding. There is no documentation of those fees, let alone billing records or anything to show that the fees were reasonable and necessary. Nor is there any basis for determining the extent to which such fees might have been incurred even had Powers not committed a crime—even had Powers not diverted the proceeds from the sale of secured hay, the Bank would likely have been forced to go to bankruptcy court to collect the debt. So, even if *some* of these costs were eligible for restitution under the MVRA, the Court cannot award them on the evidence presented. The burden is on the government to prove the amount of restitution, and this requires more than general invoices ostensibly identifying the amount of loss without further explanation. *Engelmann,* 720 F.3d 1015.

## III. Costs of Disposing of Powers' Collateral

Powers has also objected to "several questionable expenses" that the Bank incurred in selling collateral. Filing 23 at 4. His briefs do not elaborate further on this objection, but in his initial response to the PSR, Powers objected to $34,609.10 that the Bank claimed as costs of trucking and selling the hay. PSR at 17. Powers claimed that the Bank had failed to produce documentation to support these costs and that the amounts are "preposterous." PSR at 17. As previously noted, the government's restitution calculation subtracted the Bank's collection costs from the gross proceeds of the sale of collateral before crediting the net proceeds against Powers' remaining debt. Powers is essentially arguing that because some of those

- 7 -

collection costs were unreasonable, he received less credit against the principal than he should have.

Powers' objection is without merit. The Bank provided sufficiently detailed records of its collection expenses, and Friesen testified in further detail regarding the nature and necessity of the expenses. *See* filing 19-3. For that matter, the MVRA does not require the Court to offset losses by amounts that could have been avoided through proper mitigation. *United States v. Grissom*, 44 F.3d 1507, 1515 (10th Cir. 1995); *United States v. Soderling*, 970 F.2d 529, 534 & n.10 (9th Cir. 1992). That said, neither does the MVRA explicitly forbid the Court from offsetting losses in this manner. *See Soderling*, 970 F.3d at 534 n.10. But the Court finds no failure on the Bank's part to properly mitigate its damages—the costs incurred were reasonable and necessary, and Powers has failed to come forward with any evidence of what "reasonable costs" should have been.

### IV. Proceeds Returned from the Other Banks

In December 2007 and January 2008, $25,755.86 of the hay proceeds were recovered from accounts Powers had established with two other banks. Filing 19-4 at 2. Powers notes, correctly, that it is not clear what ultimately happened to these proceeds, and more importantly, whether the Bank properly credited them against his outstanding debt. The Court shares Powers' concern. If those proceeds were paid to the Bank and have not yet been deducted from the amount Powers owes, then the Bank would be receiving a double recovery, which is not permitted under the MVRA. *United States v. Louper-Morris*, 672 F.3d 539, 566 (8th Cir. 2012).

Friesen stated that the amounts were deposited into debtor-in-possession accounts at the Bank, subject to the control and guidance of the bankruptcy court. Filing 19-4 at 2; filing 31 at 38:15–40:50. And, Friesen testified, without further explanation, that the amount of restitution requested—$207,967—was not affected by the $25,755.86 in returned proceeds. Filing 31 at 1:00:00–1:01:00. But Friesen never explained why the recovered proceeds had no effect on the Bank's restitution request. It may have been because the Bank had already included the $25,755.86 in the $110,051.70 of payments made by Powers at the direction of the bankruptcy court. But if that is the case, there is no record of it in the loan balance sheet submitted by the Bank.[4] Filing 19-2 at 14. Nor has the Court discovered any other evidence that the proceeds were factored into the Bank's request.

---

[4] The payments made by Powers at the direction of the bankruptcy court, were, according to Friesen, shown on page 14 of the balance sheet. Filing 19-2 at 14; filing 31 at 26:30–28:05. None of the amounts listed appear to reflect the $25,755.86 in returned proceeds (or more accurately, the respective payments of $24,826.46 and $929.40 from each bank).

Against the Bank's otherwise careful accounting, this omission stands out. The Court therefore finds that the government has not demonstrated that these proceeds were actually accounted for, and so the $25,755.86 must be deducted from the amount requested by the Bank.[5]

As a result, the Court finds that Powers owes the Bank $138,500.60 in restitution:

| | |
|---|---|
| Principal | $81,595 |
| Interest (as of June 29, 2009) | 87,661.46 |
| Offset for payment from Trotter, Inc. | (5,000) |
| Proceeds not accounted for properly | (25,755.86) |
| Total | $138,500.60 |

### V. Assignment of the Notes

Powers next argues that because the Bank assigned the note containing the unpaid principal to Trotter, the Bank has no claim to restitution based on Powers' unpaid indebtedness. Powers acknowledges that, regardless of the Bank's assignment, the Bank is still a victim under the MVRA. Filing 41 at 1. Essentially, Powers argues that because of the assignment, the Bank no longer has an "actual loss" that is eligible for restitution. See *United States v. Chalupnik,* 514 F.3d 748, 754 (8th Cir. 2008). Powers does not argue that the loss has been extinguished; instead, he proposes that any restitution payment should go to Trotter.

Powers is correct on at least two points. First, the Bank has suffered a loss proximately caused by Powers' criminal scheme and is therefore a victim under the MVRA. Second, the assignment did not extinguish the debt. In a related vein, the Eighth Circuit has held that a victim cannot waive its right to restitution in a civil settlement with the defendant. *United States v. Stennis-Williams,* 557 F.3d 927, 930 (8th Cir. 2009). So, it stands to reason that the Bank's assignment to Trotter could not have extinguished the loss. At most, the loss was assigned to Trotter. But for that to affect the Court's award of restitution, several additional premises must also be true: first, that a victim can assign its right to restitution under the MVRA; second, that the MVRA confers the Court with the authority to honor this assignment in its restitution order; and third, that the assignment at issue actually included the Bank's interest in any restitution payments it might receive.

The Court considers each premise in turn. First, the Court has no quarrel with the proposition that a victim can assign its interest in payments it might receive under the MVRA. There is no reason to treat these

---

[5] The government concedes, in its post-hearing brief, that the $25,755.86 should be deducted from the restitution award. Filing 42 at 2.

- 9 -

differently than any other payment a person might receive. And there is nothing in the MVRA to prevent a victim from agreeing to pay over any restitution it receives. It is true that a victim does not have an independently enforceable right to receive criminal restitution. *Stennis-Williams*, 557 F.3d at 930. This just means that the party purchasing the right to receive the payments does so at their own risk. But, coming to the second premise, it does not follow that the Court may itself facilitate these transactions by ordering that the assignee be paid directly.

The Court can only order restitution as authorized by statute. *United States v. Locke*, 643 F.3d 235, 246 (7th Cir. 2011). Powers cites *United States v. Turner*, 312 F.3d 1137, 1142 (9th Cir. 2002), for the proposition that victims may assign their right to restitution and the Court may order restitution payments to be made directly to the assignee. But *Turner* dealt with the Victim and Witness Protection Act of 1982 (VWPA), now codified as amended at 18 U.S.C. § 3663. The VWPA governs discretionary awards of restitution for crimes not covered by the MVRA, but the statutes are otherwise very similar, and so courts often utilize caselaw arising under both statutes. *Chalupnik*, 514 F.3d at 752–53. In this instance, however, there is a textual difference between the two statutes.

Under the VWPA, the Court may, in any case, with the consent of the victim, order the defendant to make restitution to a person or organization designated by the victim. § 3663(b)(5). This was the provision relied upon by the *Turner* court. *See Turner*, 312 F.3d at 1141. There is no precise equivalent in the MVRA. The closest is § 3663A(b)(1)(A), which provides that, in the case of an offense resulting in damage to or loss or destruction of the *property* of a victim, the Court shall order the "return [of] the property to the owner of the property or someone designated by the owner." Assuming that provision applies,[6] it is not clear that the Bank has so designated Trotter.

Powers cites two other portions of the MVRA to support his argument that courts may honor victims' assignments of restitution payments. The first provision is not terribly persuasive, and the second does not apply. The first, § 3664(g)(2), provides that a victim may assign its interest in restitution payments to the Crime Victims Fund. This could be read to imply that the MVRA allows other assignments, but it provides no explicit authorization for the Court to pay anyone other the victim or the Fund.

Powers also points to the MVRA provisions governing payments from insurers and other third parties. Section 3664(f)(1)(B) provides that "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be

---

[6] The Eighth Circuit appears to have limited "property" to tangible property. *See Akbani*, 151 F.3d at 779–80; *but see Robers*, 698 F.3d at 939.

- 10 -

considered in determining the amount of restitution." Instead, under § 3664(j)(1), the Court must order restitution be paid to the person who provided or is obligated to provide the compensation (but only after the victim is otherwise fully compensated).

Again, these provisions provide no explicit support for Powers' position. More importantly, neither provision applies in this case, because Trotter has not provided the Bank compensation for its loss. As "compensation" is not defined in the statute, the Court turns to the ordinary meaning of the term. *See Ransom v. FIA Card Services, N.A.,* 131 S. Ct. 716, 724 (2011). "Compensate" means "to be equivalent to (as in value or effect)," and to "make up for." *Webster's Third New International Dictionary* 463 (1986). Webster's also refers the reader to "recompense," which is defined as, *inter alia*, "to give an equivalent for . . . to make up for by or as if by atoning for or requiting." *Id.* at 1897. The $5,000 from Trotter is clearly not equivalent to the Bank's loss of $138,500.60. But that makes sense, because Trotter was not acting as an insurer or otherwise seeking to compensate the Bank for its loss. Rather, Trotter was purchasing an asset: the Bank's superior security interest in the Powers' residence and a chance to collect on Powers' debt.

These provisions do, however, have another implication for Powers' case. Because the money from Trotter is not compensation, it does not fall under § 3664(f)(1)(B), and the award of restitution to the Bank may be offset by the $5,000. *Cf. United States v. Elson,* 577 F.3d 713, 733–34 (6th Cir. 2009) (while settlement for less than entire loss does not bar restitution, defendant is entitled to offset for amounts actually paid in settlement).

Powers has raised an interesting question of law: whether the MVRA confers the authority to order restitution to a party other than the victim, outside of cases involving an insurer or "other source" that has provided compensation under § 3664(f)(1)(B) and (j). At least one other court has held it does. *See United States v. Okun,* 2009 WL 2762620 (E.D. Va. 2009). But at this time, this Court need not venture its own answer, because the Court is not convinced that the Bank has actually assigned its right to restitution payments.

The assignment transferred the Bank's interest in several of the notes, including "the monies due and to become due thereon with interest." Filing 41-1. No mention is made of the Bank's right to restitution payments arising from a criminal proceeding. *Compare Turner,* 312 F.3d at 1140. And it is not clear to the Court that restitution payments under the MVRA fall under the assignment of "monies due and to become due thereon," which is naturally read as referring to the monies due under the terms of the notes (which are not before the Court). For what it is worth, Friesen testified that he did not believe the Bank had assigned its interest in restitution payments. Filing 31

- 11 -

at 48:30–50:00. Because the issue is disputed, and because there is at least a plausible argument that the Bank did not transfer its right to restitution payments, the Court declines to order that restitution be paid to Trotter. A post-sentencing restitution order is not the appropriate forum to resolve a potential contract dispute between the Trotter and the Bank. That and any other issues between Trotter and the Bank must be resolved in a separate civil action. *Cf. United States v. Boal*, 534 F.3d 965, 969 (8th Cir. 2008). In sum, the assignment does not affect the restitution Powers owes, except for the $5,000 credit discussed above.

However, because Trotter may, or may not, have a civil claim to any payments made by Powers, the Court will, out of an abundance of caution, seek to provide notice to Trotter of the restitution order that is being entered. Thus, the Court will direct the probation office to locate and notify Trotter of the restitution order that is being entered.

## VI. Friesen's Credibility

Finally, Powers attempts to impugn Friesen's credibility, arguing that Friesen conveniently "forgot" about the assignment to Trotter until cross-examination, because the Bank was trying to "sweep that transaction under the rug[.]" Filing 41 at 2–4. And Powers argues, due to these "overt attempts to misrepresent the Bank's financial position," the Court should decline to award any restitution to the Bank. Filing 41 at 4.

Powers' final argument is without merit. The Court found Friesen to be credible in his testimony. Friesen stated that he had simply forgotten about the assignment to Trotter. Given the circumstances, the oversight is understandable. The assignment occurred over 3 years ago, and only after years more spent securing and disposing of actual collateral. Nor is there any basis in the MVRA for refusing to award restitution where victims or their representatives testify with less than a perfect memory several months or years after the occurrence of a crime.

## CONCLUSION

The Court finds that Powers owes the Bank $138,500.60 in restitution. Powers' objections to the Court's tentative findings (filing 28) are overruled, except as to the $25,755.86 in returned proceeds. The Court will incorporate this finding in an amended judgment. The remainder of the original judgment, entered on October 21, 2013, will be incorporated into the amended judgment and will remain in effect.

Two additional matters must also be addressed. First, Powers has requested that the Court allow him 21 months to begin making restitution payments, so that he may first finish making the payments required by his

bankruptcy plan. Powers' request is granted in part: the first required restitution payment shall be made 180 days following Powers' discharge from incarceration. This will be reflected in the amended judgment.

Second, Powers and the government are advised that each may have a separate right to appeal the Court's order and amended judgment, as to the amount of restitution. *See United States v. Cheal*, 389 F.3d 35, 52 (1st Cir. 2004). Powers is further advised that any appeal must generally be filed within 14 days of the entry of the amended judgment. *See* Fed. R. App. P. 4(b).

An amended judgment in conformity with this memorandum and order will issue this date.

Dated this 6th day of November, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge